SEARS, ROEBUCK &
COMPANY, Appellant,

v.

Jayne Ann WOODS, Commissioner of
Revenue of the State of Tennessee,

and

Martha B. Olsen, Commissioner of
Revenue of the State of
Tennessee, Appellees.

Supreme Court of Tennessee,
at Nashville.

Feb. 24, 1986.

Lewis R. Donelson, Boyd L. Rhodes, Jr., Robert Mark Glover, Heiskell, Donelson, Bearman, Adams, Williams & Kirsch, Memphis, for appellant.

Joe C. Peel, Asst. Atty. Gen., Nashville, W.J. Michael Cody, Atty. Gen., Nashville, for appellees.

Marian F. Harrison, Alan D. Johnson, Willis & Knight, Nashville, for amicus curiae, Newspaper Printing Corp.

Kenneth H. King, Jr., Boult, Cummings, Conners & Berry, Nashville, for amicus curiae, Dayton Hudson Corp.

## OPINION

JERRY SCOTT, Special Justice.

In the context of the sales and use tax statutes, this case presents an issue of first impression in Tennessee. The question is whether preprinted advertising supplements inserted in a newspaper are part of the newspaper. The plaintiff contends that they are and that they are therefore exempt from the use tax, pursuant to TCA § 67-6-329(a)(3). The Chancellor held that the supplements are not part of the newspaper and thus subject to the use tax. In its first issue, Sears contends this was error.

Sears, Roebuck & Company is a New York corporation which operates a well-known nationwide chain of department stores. In order to promote sales at its stores, Sears spends large sums of money on advertising in the print and broadcast media. In the newspaper business, this advertising is done in a number of ways. The first is known as "run of the press" (ROP) advertising. These are the advertisements which are included in the body of the newspaper interspersed among the news and editorial contents of the paper. Their placement within the paper is determined by the newspaper staff. Newspaper advertising is also done by separate advertising sections printed by and contained in the newspaper. These sections contain no news or editorial material, but consist entirely of advertising for the particular advertiser. In the trade, these are known as "we prints". The third type of advertising is a preprinted advertising supplement, printed by an independent printer and shipped directly to the newspaper by the printer for inclusion in editions designated by the advertiser. These are known in the trade as "preprints". Only preprints are the subject of this lawsuit.

The preprints under consideration here were printed during the years 1971 through 1981 by a printer located in the state of Georgia. Sears instructed the printer to deliver the preprints to designated newspapers in Tennessee where they were stored in the newspapers' warehouses. Upon Sears' instructions, the newspapers inserted the preprints into designated editions of the papers. This was accomplished by two methods. In some instances, after the paper was printed, insertion machines were used to insert the preprints. The other method is known in the trade as "topping". In that case the preprints were delivered to the carriers in separate packages and one preprint was placed on top of each paper before it was rolled or tubed. In some instances, the carriers did not place the preprints into the paper, but delivered them as separate packages.

The preprint business has grown markedly since it began in about 1966. Newspapers have responded by developing innovative means of distributing this type of ad-

vertising. For example, newspapers can provide "total market coverage," i.e., total distribution to all homes in a targeted delivery area whether they subscribe to the newspaper or not. In addition, they can provide "total paid circulation" to all subscribers. They can also provide coverage in any smaller areas desired by the advertiser all the way down to "zoned circulation," in which only targeted portions of the circulation area will receive preprints with the newspaper. For example, if the advertiser is selling a product which can only be afforded by the rich, it is possible to deliver the preprint with the newspapers that are delivered on specified streets where the rich live, while leaving them out of papers delivered to less affluent areas. They can also provide total market coverage in a zoned area. For example, all homes within a specified radius of a particular store can be targeted for delivery of the preprints with no others receiving that particular preprint.

Because newspapers now have this flexible delivery capability, there was proof that, from time to time, they receive complaints from customers who have not received a particular preprint when they learn about it from friends who live where the preprints were distributed.

The proof also revealed that control over the preprints is retained by the advertiser. Newspapers are paid a fee for each thousand preprints that are distributed. Preprints can be recalled by the advertiser up until the time that they are actually placed into the paper for distribution. In that case they would be returned to the advertiser. Newspapers retain the right to reject preprint advertising which does not meet the newspaper's standards for good taste or decency, and Steve Harper, the Director of Advertising for Newspaper Printing Corporation, which distributes *The Tennessean* and *The Nashville Banner*, testified that his company had done so.

Because preprints often contain coupons which can be redeemed for discounts on merchandise, newspapers are required to provide additional security on their premises when preprints are in their warehouses. The newspapers must strictly account for the preprints and insure that they are not being pilfered by employees or others.

The Advertising Manager of *The Jackson Sun* testified that preprints are copyrighted by the newspaper and that microfilm copies of the newspaper do not include preprints. They are not included in newspapers that are mailed to subscribers.

Preprints are produced in various sizes ranging from the exact dimensions of the newspaper itself down to cards and mailer envelopes. Product samples such as aluminum foil and dish cloths are also distributed by newspapers as preprints.

Preprints are preferred by advertisers because they have more longevity, i.e., they are not thrown away as soon as the rest of the paper. Some preprints are printed on a better grade of paper than that used by the newspapers, and the quality of the color reproduction is far superior to that produced by the newspapers. Others are printed on newsprint. Some preprints are actually mini-catalogues.

Preprints were contrasted with the Sunday comics sections, which are printed by the Greater Buffalo Press and purchased by the newspapers. Advertising in the comics section is sold by the papers. *Parade* magazine is likewise purchased from the printer and advertisements are placed in *Parade* by the newspapers.

Sears introduced the testimony of Dr. David Furse, who conducted a market survey consisting of 932 telephone interviews with newspaper subscribers in Davidson County. The survey showed that many readers considered the advertising supplements as integral components of the paper, and their use of the papers would be materially affected by their absence. In response to that testimony, the state offered the testimony of Dr. Robert Bibb, another market researcher. Dr. Bibb evaluated Dr. Furse's study and pointed out problems in research design, sampling and data interpretation. He concluded that Dr. Furse's

study failed to show that advertising supplements are components of newspapers.

TCA § 67–6–329(a)(3) provides:

The sale at retail, the use, the consumption, the distribution, and the storage for use or consumption in this state of the following tangible personal property is specifically exempted from the tax imposed by this chapter:

. . . . .

(3) Newspapers;

The Chancellor held that Sears failed to carry the burden of proof to establish that preprints are exempt under this section of our code.

■ In tax suits as in other appeals from the Chancery Court, the case comes to this Court with a presumption of correctness, and the burden is on the appellant to show that the evidence preponderates against the findings of the Chancellor. *Morton Pharmaceuticals, Inc. v. MacFarland*, 212 Tenn. 168, 368 S.W.2d 756, 758–759 (1963).

■ The rule is also well established that taxing legislation is liberally construed in favor of the taxpayer and strictly construed against the taxing authority. However, the burden of establishing an exemption is on the taxpayer seeking it and the exemption must be expressed in clear language which includes the taxpayer. An exemption must not be broadened beyond the command of the provision. *Commercial Equities Corp. v. Tollett*, 596 S.W.2d 801, 804 (Tenn.1980).

As they have interpreted their taxing statutes, courts in other states have faced the issue of whether preprints are components of newspapers. As one would expect, there is a split of authority among the states that have considered the issue. Among the decisions holding that preprinted advertising supplements are an integral part of the newspaper and thus entitled to the same exemption from sales or use tax as the remainder of the newspaper are: *Sears, Roebuck & Co. v. State Tax Commission*, 370 Mass. 127, 345 N.E.2d 893 (1976); *Eagerton v. Dixie Color Printing Corp.*, 421 So.2d 1251 (Ala.1982); and *Dai-*

*ly Record Co. v. James*, 629 S.W.2d 348 (Mo.1982). Other courts have held that the supplements do not fall within their newspaper exemptions from sales or use tax. These cases include *Ragland v. K-Mart Corp.*, 274 Ark. 297, 624 S.W.2d 430 (1981); *Caldor, Inc. v. Heffernan*, 183 Conn. 566, 440 A.2d 767 (1981); *Wisconsin Dept. of Revenue v. J.C. Penney Co.*, 108 Wis.2d 662, 323 N.W.2d 168 (1982); and *K-Mart Corp. v. South Dakota Dept. of Revenue*, 345 N.W.2d 55 (S.D.1984).

Many of these cases rely on *Friedman's Express v. Mirror Transp. Co.*, 71 F.Supp. 991, 992 (D.N.J.1947), aff'd 169 F.2d 504 (3d Cir.1948), for the definition of a newspaper. In that case the court was called upon to determine whether the comics were an integral part of the newspaper within the meaning of an Interstate Commerce Commission exemption. The court defined a newspaper as follows:

The present-day newspaper, in addition to carrying "items of general news interest," contains enormous quantities of advertising, political comment, chess problems, cross word puzzles, what are called (and very often with lamentable inaccuracy) comics, and special features of unending variety. The sum total is known as a newspaper, and generally regarded as such. The proportion of news items to advertisements and special features varies with different papers; and in the Sunday issues of Metropolitan journals which are imposing in bulk, if not always in contents, the proportion of news to the rest of the printed and pictured matter is but small. . . .

All of this melange is contained in what are known as special sections of the paper. . . . The collection in its entirety is recognized as a Newspaper and is carried and distributed as such without distinction as to sections. Each section is thus an integral part of the newspaper, made so not because it is physically folded in a news section, but because it has assumed the character of the journal of which it is a part; and each bears at its masthead

the name of the publication of which it is a part.

Relying upon this language, the Massachusetts State Tax Commission found and the Supreme Judicial Court agreed that sales of preprinted advertising supplements were sales of "newspapers". *Sears, Roebuck and Co. v. State Tax Commission,* supra, 345 N.E.2d at 896. The Missouri Supreme Court also relied on the *Friedman's Express* definition, noting that the advertiser orders the supplement "solely to be incorporated into a newspaper," that the supplement "has no character of its own," that it is part of a newspaper when printed, and that "there is but one continuous transaction." *Daily Record Co. v. James,* supra, 629 S.W.2d at 351. However, in *Daily Record,* one judge dissented, pointing out that an advertising supplement does have a "character of its own" since those not used in the newspapers were used by the advertiser as advertising pieces in his store. The dissenter also noted that the business transaction sought to be taxed did not even involve a newspaper. Rather, the transaction was between the merchant and the printer. *Id.,* 629 S.W.2d at 352.

The Alabama Supreme Court, citing *Daily Record,* found that advertising supplements printed solely for the purpose of being inserted into a newspaper and distributed in the newspaper are integral parts of the newspaper. The Alabama Court noted that the advertiser paid the newspaper by the linear inch as it did for other advertisements carried in the newspaper. It was also noted that most supplements were printed with the masthead of the newspaper in which they were inserted and were printed according to specifications supplied by the newspaper. *Eagerton v. Dixie Color Printing Corp.,* supra, at 1252.

In *Caldor, Inc. v. Heffernan,* supra, the Connecticut Supreme Court disagreed with the Massachusetts Court's reasoning in *Sears, Roebuck* for two reasons. The first and most important concerned the identity of the parties at the time of the taxable event, i.e., when the ownership of the preprints passed from the printer to the advertiser. The only parties in privity of contract were the printer and the retailer/advertiser. The newspaper publisher had no enforceable interest at that time. Second, advertising supplements, unlike the comics, are prepared by an entity totally independent of the newspaper publisher, are not made a part of the newspaper at short, regular intervals, and do not contribute to the character of the newspaper by commanding their own regular and faithful following. Rather, it is inserted into the newspaper "to make use of the newspaper's extensive distribution system." 440 A.2d at 771. The court found that the supplement is not like a member of the "family of sections making up the newspaper, but is more similar to the occasional house guest." 440 A.2d at 772.

In *Ragland v. K-Mart Corp.,* supra, 624 S.W.2d at 432, the Supreme Court of Arkansas considered six factors in determining that preprinted advertising supplements are not "a component part of a newspaper." Applying the *Ragland* factors to this case, we find the following: 1. *Ownership*—Sears contracted directly with the printer in Georgia for the printing of its supplements. They were delivered to the newspapers by common carrier. No payment was made by the newspapers for the preprints and they could be recalled at any time prior to insertion into the newspapers and would, in that event, be kept by Sears. Sears paid fees to the newspapers for distribution of the supplements. The fees were counted toward fulfillment of ROP contracts with the newspapers.

2. *Preparation*—The supplements were prepared by others totally independent of the newspapers. They were prepared on high quality presses using either the rotary offset method or rotogravure. Newspaper presses are not used because they are designed for high speed and their production quality is not as good as the other printing processes.

3. *Regular Feature*—Advertising preprint supplements are not regular features of any newspaper. As the court noted in

*Ragland,* a supplement defines itself as such and does not purport to be a component part of the newspaper. 624 S.W.2d at 432. They are not placed in each edition of a particular newspaper, nor are they placed in the entire production of a particular edition. The times of their delivery, either with the paper or separately, and the extent of their distribution is dictated entirely by the advertiser. Preprints are not copyrighted by the newspapers, nor recorded on microfilm for their archives.

4. *Privity of Contract*—Sears contracted with the printer for the preparation of the supplements and their delivery to the designated newspapers and contracted with the newspapers for their distribution. This is in contrast to comics and other sections of the newspaper which may be printed by others but which are purchased by the newspapers for inclusion in each edition of the papers.

5. *"Supplement to" followed by "Gang Logo"*—Unlike supplements prepared by a particular newspaper, preprinted supplements either have no logo or the logo bears the words "supplement to" followed by a "gang logo," i.e., a listing of all of the newspapers by which the particular supplement is distributed.

6. *Distribution*—The advertising supplements are frequently distributed separately from the newspaper. This distribution includes circulation to nonsubscribers by the newspaper carriers, by mail and by Sears stores as free handouts.

■ Thus, it is clear that the preprinted advertising supplements are not integral parts of the "newspaper," and thus exempt under TCA § 67–3–329(a)(3).

The appellant also points to TCA § 67–6–329(10) and alleges that the legislature intended to create an exemption for such materials. In 1977, this Court held that shoppers guides were not newspapers, and not entitled to the newspaper exemption. *Shoppers Guide Publishing Co., Inc. v. Woods,* 547 S.W.2d 561, 563–564 (Tenn. 1977). In response to that decision, the legislature enacted TCA § 67–6–329(10),

which provides a sales and use tax exemption for "(s)hoppers' advertisers using newsprint distributed in Tennessee or within a twenty-five (25) mile radius thereof at regular intervals and provided without charge to the shopper." Public Acts of 1977, ch. 487, § 1.

■ Sears contends that this exemption clearly demonstrates a legislative intent to broaden the "newspaper" exemption to include preprinted supplements. However, this exemption is narrowly drawn and includes only "shoppers' advertisers," which are produced on "newsprint," distributed "at regular intervals" and "without charge to the shopper." The preprints are not usually printed on newsprint. They are distributed at irregular intervals as determined by Sears. The subscribers to the newspapers pay to receive the preprints along with their newspapers.

In *Shoppers Guide* this Court approved and adopted the definition of "newspaper" found in Rule 46 of the State Sales and Use Tax Regulations. *Id.* In exempting shoppers' guides, the General Assembly accepted this Court's definition of "newspaper," and did not attempt to rewrite the statute to bring shoppers' guides within the definition. Rather, the legislature carved out a narrow exemption for those advertising materials.

Alternatively, Sears argues that the preprinted supplements are exempt from taxation since TCA § 67–6–102(13)(E) provides:

"Sale at retail," "use," "storage," and "consumption" shall not include the sale, use, storage or consumption of industrial materials and explosives for future processing, manufacture or conversion into articles of tangible personal property or (sic) resale where such industrial materials and explosives become a component part of the finished product or are used directly in fabricating, dislodging, sizing, converting, or processing such materials or parts thereof, and such terms shall not include materials, containers, labels, sacks, bags or bottles used for packaging tangible personal property when such property is either sold therein directly to

the consumer or when such use is incidental to the sale of such property for resale;

Sears claims that this statute is applicable because the insertion of the supplements into the newspaper by machine or by hand constitutes a "future processing" of the preprints.

■ However, this argument misses the intent of the statute. The statute provides an exemption for raw materials which, when processed become a component part of a finished product. The preprints did not come into the hands of the newspapers as raw materials awaiting conversion into something different. Instead, they arrived as finished products, needing only to be inserted into or "topped" with the newspaper immediately prior to distribution, solely to facilitate the process of their distribution. In order to qualify for the component part exemption, the materials must have actually gone into the finished product as an ingredient or component, either chemically or mechanically. *Kingsport Publishing Co. v. Olsen*, 667 S.W.2d 745, 746 (Tenn.1984). The preprinted supplements were never "component parts" of the newspaper.

Sears also contends that it makes no taxable use of the preprinted supplements within this state.

Relying on *Miller Bros. Co. v. Maryland*, 347 U.S. 340, 74 S.Ct. 535, 539, 98 L.Ed. 744 (1954), Sears argues that due process is violated by imposition of the tax since there is no "definite link," or "minimum connection" between the "state and the person, property or transaction it seeks to tax." Sears argues that there must be an actual exercise of right or power over the supplements within the State of Tennessee which is incidental to their ownership before this state can impose a use tax upon them.

TCA § 67–6–102(18)(A) defines "use" for the purpose of the sales and use tax statutes as "the exercise of any right or power over tangible personal property incident to the ownership thereof" except its sale at

retail. TCA § 67–6–102(19) provides that the "use tax" applies to the "use," "consumption," "distribution" and "storage" of property.

■ There was an actual exercise of the right or power over the supplements in this state. Sears never relinquished ownership of the supplements until they reached the individual consumer, retaining the power to determine the dates of distribution, the number of preprints to be distributed, the manner of their distribution, the areas where they were distributed and to even pinpoint individual newspaper subscribers who would receive them. The power to allow property one owns to be used for one's benefit, such as for profit-making purposes, is a taxable privilege of use. *Woods v. M.J. Kelley Co.*, 592 S.W.2d 567, 571 (Tenn.1980). That is clearly what Sears did with its preprints.

Sears relies on *Sears, Roebuck and Co. v. State Department of Revenue*, 97 Wash.2d 260, 643 P.2d 884, 885 (1982), *District of Columbia v. W. Bell and Co., Inc.*, 420 A.2d 1208, 1210 (D.C.App.1980), *Mart Realty, Inc. v. Norberg*, 111 R.I. 402, 303 A.2d 361, 366 (1973), *Bennett Bros., Inc. v. State Tax Commission*, 62 A.D.2d 614, 405 N.Y.S.2d 803, 805 (1978), and other cases from lower courts and taxing agencies for the proposition that no taxable use occurs when printed materials which were printed out of state are delivered directly to third parties within the state. However, those cases, except *Sears*, involved the delivery of catalogs by mail. In *Sears*, the Washington court did not actually consider that issue. Rather, the Supreme Court mentioned the trial court's holding concerning mailed catalogs, from which there was no appeal. In this case the preprints were not delivered in the state by the Post Office, but were distributed by newspapers acting at Sears' direction.

■ Finally, Sears asserts three constitutional grounds upon which it attacks the use tax on preprinted supplements. First, it claims that the use tax as applied to its supplements is essentially a taxing of protected commercial speech, and, therefore,

violates the constitutional guaranty of freedom of the press set forth in the First Amendment of the U.S. Constitution.

▆ This Court has already rejected Sears' argument. The use tax is not a tax on "the privilege of disseminating information to the public." Rather, it is "a general tax applying to all persons, whatever their business" who use tangible personal property. *Shoppers Guide Publishing Co. v. Woods,* supra, at 564.

▆ In addition, Sears has a severe standing problem in attempting to argue that this tax is a violation of the freedom of the press. Sears is a retailer of general merchandise, not a newspaper publisher or printer.

Furthermore, Sears has failed to show how the tax has adversely affected the press. The proof showed that even though the tax was levied against Sears, the distribution of preprinted newspaper supplements rose dramatically during the period involved in this suit.

Sears also contends that the imposition of the tax on preprints is an unconstitutional interference with interstate commerce, in violation of Article I, § 8(3) of the U.S. Constitution. Relying upon *Illinois Central Railroad Co. v. DeFuentes,* 236 U.S. 157, 35 S.Ct. 275, 276, 59 L.Ed. 517 (1915), Sears argues that the ultimate destination of the preprints is the consumer and that they remain in the stream of interstate commerce until they reach the consumer.

▆ The proof in this case revealed that the preprints were printed in another state and shipped by common carrier to the newspapers' warehouses in this state where they sat in storage for an extended period before being distributed by the newspapers. This stoppage in transit was not merely incidental to the interstate journey. Rather, it was the result of a business decision by Sears as to exactly which editions of the newspapers would have supplements, which days they would be distributed and which circulation methods would be employed. When property has come to rest within a state and is held there at the pleasure of its owner, for disposal or use, either within or without the state, as his interest dictates, it becomes part of the general mass of property within that state and is subject to its taxing power. *Minnesota v. Blasius,* 290 U.S. 1, 54 S.Ct. 34, 37, 78 L.Ed. 131 (1933). Had Sears had the preprints delivered to its warehouse from which carriers were dispatched to deliver them, there could be little doubt that they would be subject to taxation. The employment of an agent with the necessary expertise and a distribution network already in place to perform for Sears will not allow it to escape taxation. *Deere & Co. v. Allphin,* 49 Ill.App.3d 164, 7 Ill.Dec. 130, 364 N.E.2d 117, 119 (1977). Thus, it is clear there was no interference with interstate commerce by the taxation of the preprints.

Sears also complains that the imposition of the use tax violates TCA § 67–6–313 which provides that it is not the intention of the sales and use tax chapter to levy a tax on "bona fide interstate commerce." Sears relies on *Service Merchandise Co., Inc. v. Tidwell,* 529 S.W.2d 215, 219–220 (Tenn.1975). However, that is another of the "catalogs in the mail" cases, in which preaddressed labels were affixed before each catalog began its interstate journey. The catalogs were trucked to local Post Offices in Tennessee to take advantage of lower local postage rates. This Court held that this was only a "temporary interruption in the interstate transit" which was "solely for the purpose of promoting the continuing movement of the printed material in its journey to the ultimate recipients."

The interruption in transit in this case was not temporary, but was for the purpose of allowing Sears the flexibility it desired in its distribution process as it sought to pinpoint the dates, places and times of distribution.

Finally, Sears complains that the application of the use tax to preprinted supplements violates the Equal Protection Clause of the Fourteenth Amendment of the U.S. Constitution. It argues that the state has singled out preprinted supplements for the tax while exempting the advertising print-

ed within the newspapers and by the exemption of shoppers' guides.

A state law is not arbitrary even though it discriminates in favor of a certain class, if that discrimination is founded upon a reasonable distinction or difference in state policy, not in conflict with the Constitution. *Kahn v. Shevin,* 416 U.S. 351, 355, 94 S.Ct. 1734, 1737, 40 L.Ed.2d 189 (1974). Courts will not invalidate tax statutes on the basis of equal protection so long as the classification and selection are reasonable. The legislature has wide discretion in the adoption of tax measures, since they produce the revenue with which government operates, and it may impose special burdens on defined classes to achieve permissible ends. While not unrestrained, the legislature's judgment must be respected and its enactments must be given every intendment. The test is whether a statute rests on a reasonable basis. It will not be held discriminatory if there is any possible reason or justification for its passage. *Genesco, Inc. v. Woods,* 578 S.W.2d 639, 641 (Tenn.1979).

The purpose of the newspaper exemption is to guarantee freedom of the press and to relieve newspapers of this tax burden. Shoppers' advertisers have most of the characteristics of newspapers in that they are produced on the same quality paper and regularly distributed by carriers in precisely the same manner that newspapers are distributed.

However, even if this Court were to find that the exemptions for newspapers and shoppers advertisers are violative of the Equal Protection Clause, it would provide Sears no remedy. Striking down of the exemptions for these publications would simply bring them within the ambit of the tax and would not remove preprints from the coverage of the tax. Courts cannot create a tax exemption where the legislature has not provided one.

The taxing power of the state is an attribute of sovereignty and exclusively a legislative function. *Waterhouse v. Public Schools,* 68 Tenn. (9 Baxter) 398, 400 (1876). The legislature alone has the right to determine all questions of time, method,

nature, purpose and extent in respect to the imposition of taxes, including the subjects on which the power may be exercised. 84 C.J.S. (Taxation) § 7, pp. 51–55. Among all the institutions of the state, there is no agency vested with authority to restrain the legislative discretion in the exercise of its power in levying taxes. *Nashville, C. & St.L.Ry. v. Carroll County,* 161 Tenn. 581, 33 S.W.2d 69, 70 (1930). Of course, the taxing power is restrained by the federal and state constitutions. 84 C.J.S. (Taxation) § 6, p. 48. The power to exempt property from taxation, like the power to tax, is an attribute of sovereignty exercised by the legislature. Indeed, the selection of any subjects for taxation is an exemption of those subjects not selected. 84 C.J.S. (Taxation) § 216, pp. 414–415. In short, the selection of subjects for tax exemption is a legislative, not a judicial function. *Hulse v. Kirk,* 28 Ill.App.3d 839, 329 N.E.2d 286, 289 (1975).

There is no merit to any of the issues presented by Sears. The judgment of the Chancery Court is affirmed. Costs are taxed against the plaintiff/appellant.

COOPER, C.J., and HARBISON, BROCK and DROWOTA, JJ., concur.

FONES, J., not participating.